**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**


**SOUTHERN SURGERY CENTER, LLC;
SOUTHERN BONE & JOINT SPECIALISTS, P.A.;
AND SOUTHERN DEVELOPMENT RESOURCES, LLC**                    **PLAINTIFFS**


**VERSUS**                              **CIVIL ACTION NO. 2:07cv181KS-MTP**

**FIDELITY AND GUARANTY
INSURANCE COMPANY**                              **DEFENDANT**


**MEMORANDUM OPINION AND ORDER**

This matter is before the court on a Motion for Summary Judgment **[#97]** filed on

behalf of defendant Fidelity and Guaranty Insurance Company ("FGIC") and on a

Motion for Summary Judgment **[#91]** filed on behalf of the plaintiffs.  The court, having

reviewed the motions, the responses, the pleadings and exhibits on file, the briefs of

counsel and being otherwise fully advised in the premises, finds that the motion filed by

FGIC is well taken and should be granted and that the motion filed by the plaintiffs is

not well taken and should be denied.  The court specifically finds as follows:


**FACTUAL BACKGROUND**

The plaintiffs in this case provide orthopedic medical treatment and services to

patients in the Hattiesburg, Mississippi area.  As part of this work, the plaintiffs own and

operate a clinic, an MRI and an outpatient surgical facility at 3688 Veterans Memorial Drive in Hattiesburg.  All of the plaintiffs are closely related entities.  Southern Development Resources, LLC ("SDR") owns the building and improvements located at 3688 Memorial Drive.  SDR employs all of the support and ancillary staff of the facility and leases them and the facility to the other two plaintiffs.

Southern Bone & Joint Specialists, P.A. ("SB&J" or "Southern Bone & Joint"), is the clinical operation of the member physicians.  Southern Surgery Center, LLC ("SSC" or "Southern Surgery"), is the outpatient surgical facility owned and operated by most of the same physicians who comprise the clinical practice of SB&J.  The physicians make up the Board of Directors and the Board of Management of all three entities.  All three entities operate under the same Chief Executive Officer and the same Chief Financial Officer.

Hurricane Katrina struck Hattiesburg and the surrounding areas on August 29, 2005, causing widespread property damage.  At the time of Hurricane Katrina, the plaintiff Southern Surgery was insured by defendant Fidelity and Guaranty Insurance Company ("FGIC") policy number BK02126424, effective June 19, 2005, through June 19, 2006.  The plaintiff Southern Bone and Joint was insured by policy number BK02126425, also issued by FGIC for the policy period June 19, 2005, through June 19, 2006.  The plaintiff Southern Development Resources was insured under policy number BK02103067 issued by defendant United States Fidelity and Guaranty Company effective for the period of June 19, 2005, through June 19, 2006.

Following Hurricane Katrina, the plaintiffs asserted claims for alleged losses under their individual policies of insurance issued by FGIC and USF&G.  The Building

and insured premises, owned by SDR, incurred physical damage resulting from Katrina. Specifically, the storm caused damage to the roof and some flashing.  Some of the roof-mounted air-conditioners also shifted during the hurricane and SDR suffered damage to a fence and landscaping around the Building and damage to a sign for the Building.  USF&G paid all of the claims submitted by SDR and USF&G has been dismissed as a defendant in this action.  This action arose because FGIC denied the business income loss claims of Southern Bone & Joint  and Southern Surgery.  Thus, the sole dispute in this case is whether the subject insurance policies provide coverage for claims made for alleged business income losses.

After the dispute regarding coverage of the asserted claims, the plaintiffs filed suit in the Circuit Court of Forrest County, Mississippi, on August 10, 2007, raising claims of breach of contract, tortious breach of contract and breach of good faith and fair dealing allegedly entitling them to compensatory and punitive damages against three defendants, two of which have already been dismissed.  Only FGIC remains as a defendant.

Southern Bone and Southern Surgery both leased space from SDR at the time of Hurricane Katrina.  Southern Bone and Southern Surgery each filed a claim with FGIC for business income losses arising from Hurricane Katrina based on their claims that damage from Hurricane Katrina caused a suspension of the business operations of Southern Bone & Joint  from August 29, 2005, through September 7, 2005, and of Southern Surgery one day longer, through September 8.  Southern Bone & Joint also owned and operated a Magnetic Resonance Imaging ("MRI") unit at the location and claims the MRI unit was inoperable from August 29 until September 14.  The evidence

-3-

reveals that the MRI unit suffered no physical damage and that the problem with the operation of the MRI was related to the Building's general loss of electrical power and the need to reheat the magnet in the unit to its proper operating temperature after the restoration of power.

The defendant argues that the closure of the businesses and resulting claims for loss of business income correlate directly with the loss of power from the storm and points out that such was restored on September 7, after which, business operations were resumed as stated above.  Thus, the defendant argues that the plaintiffs cannot prove that they suffered any damages that were caused by anything other than the loss of power which occurred off the premises and is excluded under the terms of both policies.

After the storm, SDR hired Finlo Construction ("Finlo") to perform the repairs to the Building.  Finlo completed all repairs to the Building between January 25, 2006 and April of 2006.  It is undisputed that the Building was open and the plaintiffs resumed operations in September 2005 before and during all repairs by Finlo.

FGIC asserts that it promptly and thoroughly investigated the claims filed by the plaintiffs initially through an independent adjuster, Nolan Cunningham.  FGIC then assigned two other adjusters, one to Southern Bone & Joint's claim and one to Southern Surgery's claim, to complete the claims process.  Both FGIC adjusters ultimately concluded that the physical damage to the Building did not cause a necessary suspension of business operations and that the suspension of operations was actually caused by an off-premises general power failure.  This conclusion was supported by an affidavit from Mississippi Power Company personnel that the loss of

-4-

power to the Building occurred off the premises.

FGIC notified Southern Bone & Joint and Southern Surgery of its conclusions by letters dated December 11, 2005, and February 22, 2006, respectively.  Thereafter, the plaintiffs brought the instant suit.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure, Rule 56(c) authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  The existence of a material question of fact is itself a question of law that the district court is bound to consider before granting summary judgment.  *John v. State of La. (Bd. of T. for State C. & U.)*, 757 F.2d 698, 712 (5th Cir. 1985).

A Judge's function at the summary judgment stage is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L.Ed.2d 202, 106 S.Ct. 2505 (1986).

Although Rule 56 is peculiarly adapted to the disposition of legal questions, it is not limited to that role.  *Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis*,

799 F.2d 218, 222 (5th Cir. 1986).  "The mere existence of a disputed factual issue, therefore, does not foreclose summary judgment.  The dispute must be genuine, and the facts must be material." *Id.*  "With regard to 'materiality', only those disputes over facts that might affect the outcome of the lawsuit under the governing substantive law will preclude summary judgment." *Phillips Oil Company v. OKC Corporation*, 812 F.2d 265, 272 (5th Cir. 1987).  Where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law, . . . all other contested issues of fact are rendered immaterial. *See Celotex*, 477 U.S. at 323, 106 S.Ct at 2552." *Topalian v. Ehrman*, 954 F.2d 1125, 1138 (5th Cir. 1992).  In making its determinations of fact on a motion for summary judgment, the Court must view the evidence submitted by the parties in a light most favorable to the non-moving party. *McPherson v. Rankin*, 736 F.2d 175, 178 (5th Cir. 1984).

The moving party has the duty to demonstrate the lack of a genuine issue of material fact and the appropriateness of judgment as a matter of law to prevail on his motion. *Union Planters Nat. Leasing v. Woods*, 687 F.2d 117 (5th Cir. 1982).  The movant accomplishes this by informing the court of the basis of its motion, and by identifying portions of the record which highlight the absence of genuine factual issues. *Topalia*n, 954 F.2d at 1131.

"Rule 56 contemplates a shifting burden:  the nonmovant is under no obligation to respond unless the movant discharges [its] initial burden of demonstrating [entitlement to summary judgment]." *John*, 757 F.2d at 708.  "Summary judgment cannot be supported solely on the ground that [plaintiff] failed to respond to defendants'

motion for summary judgment," even in light of a Local Rule of the court mandating such for failure to respond to an opposed motion.  *Id.* at 709.

However, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence.  *Ferguson v. National Broadcasting Co., Inc.*, 584 F.2d 111, 114 (5th Cir. 1978).  In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact."  *In Re Municipal Bond Reporting Antitrust Lit.* , 672 F.2d 436, 440 (5th Cir. 1982).  To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. The nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  Rule 56(e), Fed.R.Civ.P.  *See also, Union Planters Nat. Leasing v. Woods*, 687 F.2d at 119.

While generally "'[t]he burden to discover a genuine issue of fact is not on [the] court,' (*Topalian* 954 F.2d at 1137), 'Rule 56 does not distinguish between documents merely filed and those singled out by counsel for special attention-the court must consider both before granting a summary judgment.'"  *John*, 757 F.2d at 712 (quoting *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406, 410 (5th Cir. 1980)).

Under Mississippi law, a plaintiff has the burden of proving a right to recover under an insurance policy sued on, and this basic burden never shifts from the plaintiff. *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 625 (5th Cir. 2008) (citing *Britt v. Travelers Ins. Co.*, 566 F.2d 1020, 1022 (5th Cir. 1978)).  Where the claimed source

of coverage is a coverage extension, the insured has the burden of proving that its loss is covered under that coverage extension.  *State Farm Fire and Cas. Co. v. Shady Grove Baptist Church*, 838 So.2d 1039, 1043 (Ala. 2002) (holding that insured had burden of proof under coverage extension).

Mississippi courts interpret insurance policies according to contract law.  *Am. States Ins. Co. v. Nethery*, 79 F.3d 473, 475 (5th Cir. 1996)(citing *Aero Int'l, Inc. v. U.S. Fire Ins. Co.*, 713 F.2d 1106, 1109 (5th Cir. 1983)).  It is hornbook law that in Mississippi "the insurance contract determines the rights of the parties unless the contractual provisions are contrary to public policy."  *Gladney v. Paul Revere Life Ins. Co.*, 895 F.2d 238 241 (5th Cir 1990)(citing *Cauthen v. National Bankers Life Ins. Co.*, 228 Miss. 411, 88 So.2d 103, 104 (1956)).

The Mississippi rules of construction of insurance policies were succinctly set forth in the Fifth Circuit case of *Centennial Insurance Company v. Ryder Truck Rental Inc.*, 149 F.3d 378 (5th Cir. 1998).  Those rules are as follows:

> First, where an insurance policy is plain and unambiguous the court must construe that instrument like other contracts, exactly as written. (Citation omitted).  Second, it reads the policy as a whole, thereby giving effect to all provisions.  (Citation omitted).  Third, it must read an insurance policy more strongly against the party drafting the policy and most favorably to the policyholder.  (Citation omitted).  Fourth, where it deems the terms of an insurance policy ambiguous or doubtful, it must interpret them most favorably to the insured and against the insurer.  (Citation omitted).  Fifth, when an insurance policy is subject to equally reasonable interpretations, a court must adopt the one giving the greater indemnity to the insured. (Citation omitted). Sixth, where it discerns no practical difficulty in making the language of an insurance policy free from doubt, it must read any doubtful provision against the insurer.  (Citation omitted).  Seventh, it must interpret terms of insurance policies, particularly exclusion clauses, favorably to the insured wherever reasonably possible.  (Citation omitted).  Finally, although ambiguities of an insurance policy are construed against

the insurer, a court must refrain from altering or changing a policy where terms are unambiguous, despite resulting hardship on the insured. (Citation omitted).

149 F.3d at 382-383.


## THE PERTINENT POLICY LANGUAGE

The language of both Policies is identical and provides the following coverage:

**SECTION I - COVERAGE**

**A.      Coverage Provided**.

We will pay for direct physical loss to Covered Property at the premises described in the Schedule of Premises caused by or resulting from any Covered Cause of Loss….

(Policy at pp. 1 and 9 of 38, Form CL/BF 10 10 09 99).  The Policies also contain a list

of property that is expressly not covered under the Policies as follows:

**2.      Property Not Covered.**

Covered Property does not include . . . Transmission and communication lines, that are off the premises described in the Schedule of Premises.

Policy at pp. 2 of 38, Form CL/BF 10 10 09 99; Policy at p. 1 of 10, Form CL/BF 11 68

09 02.  The Policies also include "additional coverages."  Specifically at issue in this

case, is the business income additional coverage, which provides:

**4.      Additional Coverage.**

Coverage provided by these Additional Coverages is in addition to the Limits of Insurance shown in the Property Coverage Part Declarations.

However, we will pay only for loss or damage you sustained through covered causes of loss which occur during the policy period. Regardless of the number of years these Additional Coverages remain in force or the number of premiums paid, no Limit of Insurance is accumulated from

policy period to policy period.

* * *

    **b.**    **"Business Income," "Extra Expense," Action by Civil Authority, and "Expediting Expense."**

        The following additional coverages; "Business Income," Extended Business Income, "Extra Expense," Action By Civil Authority, and "Expediting Expense," apply when a Covered Time Period is shown in the Property Coverage Part Declarations for "Business Income" and "Extra Expense."

        **(1)**    "Business Income."  We will pay the actual loss of "business income" you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss to Property (other than those items listed in SECTION I. A. 2.), including Property Off Premises, and result from any Covered Cause of Loss.

                    * * *

        **(4)**    Action by Civil Authority. We will pay for the actual loss of "business income" you sustain and necessary "extra expense" caused by action of civil authority that prohibits access to the described premises due to direct physical loss to property, other than at the described premises, caused by or resulting from any Covered Cause of Loss.

                    * * *

        **(5)**    We will not pay for any increase of loss caused by or resulting from:

                    * * *

        **(c)**  Any other consequential loss;

Policy at pp. 8-9 of 38, Form CL/BF 10 10 09 99; Policy at p. 2 of 10, Form CL/BF 11 68

09 02.  The Policies expressly define the phrase "Covered Causes of Loss" as follows:

    **B.**    **Covered Causes of Loss.**

        **(1)**    Risks of direct physical loss unless the loss to Covered Property is excluded in this Coverage Part;

-10-

Policy at p. 22 of 38, Form CL/BF 10 10 09 99.  Finally, the Policies contain the

following exclusions which the defendant argues applies to the plaintiffs' claims arising

out of Hurricane Katrina:

**C.    Exclusions.**

    **1.**    We will not pay for loss to Covered Property caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. Unless otherwise stated, the following exclusions apply to all SECTION I - Coverages.

              * * *

    **e.**    **Power Failure**. The failure of power or other utility service supplied to the premises described in the Schedule of Premises, however caused, if the failure does not take place on the described premises. But if the failure of power or other utility service results in a Covered Cause of Loss, we will pay for the loss caused by that Covered Cause of Loss.

              * * *

    **2.**    We will not pay for loss caused by or resulting from any of the following. Unless otherwise stated, the following applies to all SECTION I - Coverages.

              * * *

    **c.**    **Consequential Loss**, including delay, loss of use or loss of market.

              * * *

    **j.**    **Other Types of Loss**.

              * * *

        **(7)**    The following causes of loss to personal property:

            **(a)**  Dampness or dryness of atmosphere;

            **(b)**  Changes in or extremes of temperature; . . .

             * * *

        But if an excluded cause of loss that is listed in SECTION I. C. 2. j. (1) through j. (7) above results in

> a "specified cause of loss", "accident" or building
> glass breakage we will pay for the loss caused by that
> "specified cause of loss", "accident" or building glass
> breakage.

Policy at pp. 22-26 of 38, Form CL/BF 10 10 09 99.


## **ANALYSIS**

The defendant argues that a "direct physical loss" to the Building, as required by the policy, did not cause the plaintiffs' alleged loss of business income.  FGIC asserts that the only "direct physical loss to Covered Property" in this case was the roof/flashing damage, shifted air-conditioning units on the roof, and damage to the Stryker switchpoint units and that the plaintiffs were paid for this damage.  According to the defendant, this damage, however, did not cause a loss of business income.  Rather, FGIC argues, this case primarily concerns the plaintiffs' temporary loss of power to the Building, thus, the plaintiffs' damages, if any, are merely indirect or consequential, and do not constitute a "direct physical loss."

The plaintiffs assert that there were leaks and condensation in the Building in addition to the outside structural damage.  However, it is undisputed that such leaks did not damage any of the plaintiffs' equipment.  Additionally, such leaks did not impact employee and/or customer access to the Building.

The plaintiffs assert that the policy language regarding the power loss exclusion is ambiguous because the adjuster who handled the SDR claim and the two adjusters who handled the Southern Bone & Joint and Southern Surgery claims interpreted the language differently.  The adjuster on the SDR claim concluded that loss of business

income was payable under the USF&G policy while the two adjusters reviewing identical language in the FGIC policies concluded that it was not.  USF&G's 30(b)(6) representative testified that the business loss claim was "paid in error."  Regardless, a disagreement over the meaning of policy language by different agents or adjusters does not render the language ambiguous.  The initial question of ambiguity is a question of law for the court.  *See Benchmark Health Care Ctr., Inc. V. Cain*, 9112 So.2d 175 (Miss. 2005).

The plaintiffs further provide the somewhat novel argument that damage to property covered under the Policies is not required with regard to the plaintiffs' loss of business income claims.  Specifically, the plaintiffs assert that the "Business Income," "Extra Expense" and "Action by Civil Authority" provisions of the policy do not "require direct physical loss to 'Covered Property.'" The plaintiffs, essentially, ask the court to read these provisions in a vacuum without regard for the remaining terms of the Policies.  They seem to argue that where any property (covered or uncovered) is damaged, FGIC owes for a resulting loss of business income.  However, the plaintiffs' argument is in direct conflict with the plain language of the Policies.

The simple fact of the matter is that the "Power Failure Exclusion" is plain and unambiguous.  The policy language excludes from all Section I coverages any loss which is caused by "[t]he failure of power or other utility service supplied to the premises described in the Schedule of Premises, however caused, if the failure does not take place on the described premises."  The evidence presented is clear that the failure of power to the premises resulted from a failed power line or transformer malfunction away from the insured premises.  It is true that power failed <u>at</u> the

-13-

premises, but the policy clearly requires the power failure to occur <u>on</u> the premises in order to cover any losses resulting therefrom.  Any other interpretation of this clause which excludes damages to the insured premises resulting from a failure of power away from the insured premises would make the entire clause meaningless.  *See Mapletown Foods, Inc. V. Motorists Mutual Insurance Company*, 662 N.E.2d 48 (Ohio 1995); *Lakes' Byron Store v. Auto-Owners Insurance Co.*, 589 N.W.2d 608 (South Dakota 1999); and *Gies v. City of Gering*, 695 N.W.2d 180 (Neb. 2006).  Thus, the court concludes that the plaintiffs' alleged loss of business income and extra expense claims did not result from a direct physical loss to "Covered Property" as required by the policies.

There is one additional argument which also bears on this matter.  Both policies have a so-called  "Anti-Concurrent Cause" ("ACC") clause contained in the prefatory language of Section C - Exclusions.  It provides "We will not pay for loss to Covered Property caused directly or indirectly by any of the following.  Such loss is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."  Policy at page 22 of 38, Form CL/Bf 10 19 09 99.  The language of this clause "denies coverage whenever an excluded peril and a covered peril combine to damage a dwelling or personal property."  *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 425 (5th Cir. 2007).  The *Leonard* court held that such clauses are valid and enforceable in Mississippi and that language virtually identical to that  contained in the present ACC clause herein was not ambiguous.  In spite of this clause, the plaintiffs argue that there is a genuine dispute as to what damages were caused by the power failure and what were caused directly by the storm which contributed to the suspension

-14-

of operations which caused their alleged business losses.  However, the evidence indicates that their entire claim for business losses and extra expenses was caused, ultimately, by the failure of power.  They suspended operations when the power failed and resumed operations as soon as power was restored.

Regardless, none of the direct damages to the Building or equipment, which damage, coincidentally, has been paid, contributed to the suspension of operations or prevented the resumption thereof.  Nevertheless, the exclusionary language of the ACC clause applies and would negate coverage, even if the situation was not as described. Any coverage for damage caused by the loss of power away from the insured premises is excluded under the plain wording of the policy.  Any damages, consequential or otherwise, caused by a concurrent covered event are thus excluded by the Anti-Concurrent Cause clause when damage is also caused by  anon-covered or excluded event..

IT IS THEREFORE ORDERED AND ADJUDGED that the Motion for Summary Judgment **[#97]** filed on behalf of defendant  Fidelity and Guaranty Insurance Company is granted and the plaintiffs' claims against it are dismissed with prejudice. Consequently, the Motion for Summary Judgment **[#91]** filed on behalf of the plaintiffs is denied and any other pending motions are denied as moot.  A separate judgment shall be entered herein in accordance with Rule 58, Federal Rules of Civil Procedure.

SO ORDERED AND ADJUDGED this 10th day of October, 2008.


*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE